# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 22-1098V

|  |  |
|---|---|
| JOANNE S. TAYLOR,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: January 28, 2026 |

*Ramon Rodriguez, III, Siri & Glimstad LLP, Richmond, VA, for Petitioner.*

*Adam Nemeth Muffett, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On August 26, 2022, Joanne S. Taylor filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an influenza ("flu") vaccine received on January 6,

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to settle the claim, and have now fully briefed entitlement and damages (ECF Nos. 54, 55, 57). For the reasons set forth herein, I find that Petitioner's shoulder pain likely began within 48 hours of vaccination, and she is entitled to compensation otherwise. For damages, I award $110,000.00 for actual pain and suffering, plus $403.43 for past unreimbursable expenses.

## I.      Factual Evidence

### A.  Medical Records

Petitioner received a flu vaccine in her left deltoid on January 6, 2020, during a follow up appointment with her primary care provider ("PCP") for a chronic condition. Ex. 13 at 112, 124. Two months later (March 11, 2020), she saw an unrelated specialist, with whom she discussed medication. Ex. 8 at 279. She did not mention shoulder pain.

Three months after vaccination (April 5, 2020), Petitioner sent a message to her PCP about several health concerns. Ex. 36 at 3. She now reported that her "[l]eft shoulder [was] very sore. The injection site for my flu shot is still very sore and painful." *Id*.

The following month, Petitioner saw orthopedist Dr. Irfan Ansari for left shoulder pain. Ex. 3 at 30. She explained that the pain "[s]tarted after a flu shot back in February," – misstating the month of vaccination – and she now had loss of motion and strength. *Id*. She had taken ibuprofen intermittently, but the pain was not improving. *Id*. Her pain ranged between three and five out of ten, and was worse with activity, occasionally waking her from sleep. *Id*. On examination, Petitioner exhibited mildly limited range of motion ("ROM"), with active forward elevation to 160-170 degrees, and mildly positive Neer and Hawkins impingement signs. *Id*. Dr. Ansari assessed her with "[l]eft shoulder pain status post injection, likely cuff tendinitis." *Id*. He prescribed anti-inflammatory medication and recommended physical therapy ("PT"). *Id*.

Petitioner underwent a PT evaluation of her left shoulder on June 10, 2020. Ex. 12 at 42. The evaluation record lists an onset date of February 1, 2020, explaining that the "[m]echanism of onset is increasing pain and stiffness in L shoulder following flu shot in February 2020. Pt reports pain began at site of injection and gradually moved up to shoulder." *Id*. Petitioner rated her pain two to three out of ten at rest, rising to six out of ten with use. *Id*. On examination, her left shoulder active ROM was 125 degrees in flexion (compared to 180 degrees on the right), 95 degrees in abduction (compared to 170 degrees on the right), and 45 degrees in external rotation (compared to 70 degrees on the right), with slightly reduced ROM in extension and internal rotation as well. *Id*. at 43-44. Petitioner attended a total of 12 PT sessions between June 10 and September 3,

2020. *Id*. at 42-85. During this time, her pain generally ranged between two to four out of ten, sometimes rising to six out of ten with use. *Id*.

On June 22, 2020, Petitioner messaged her PCP, stating that she "wanted to discuss what's happened with my left shoulder since my flu shot," stating that she expected he had received a report from Dr. Ansari. Ex. 36 at 6. Her PCP responded that he had reviewed Dr. Ansari's note, and had "seen cases in which reaction to the flu shot injected into the muscle of the shoulder can cause muscle inflammation/tendinitis." *Id*.

The next day, Petitioner saw her PCP via telemedicine for an annual examination. Ex. 13 at 67. The record of this visit does not mention shoulder pain.

On August 13, 2020, Petitioner saw physician assistant ("PA") Jason Grabrovac in Dr. Ansari's office for reevaluation of her left shoulder. Ex. 3 at 26. The record notes that Petitioner "was seen several months ago for left shoulder pain following a flu shot in January." *Id*. at 28. Petitioner reported that the pain was not improving, and the medication Dr. Ansari prescribed upset her stomach so she was now using ibuprofen. *Id*. She had noticed improvement in her pain with PT, but still had significant pain sleeping on her shoulder at night and with shoulder elevation. *Id*. On examination, her ROM remained limited, with positive impingement signs. *Id*. Because anti-inflammatory medication and PT had not resulted in significant improvement, PA Grabrovac ordered an MRI. *Id*.

Petitioner's left shoulder MRI showed rotator cuff tendinosis with a partial tear of the supraspinatus tendon, moderate to severe acromioclavicular osteoarthritis, a small glenohumeral joint effusion, and mild subacromial/subdeltoid bursitis. Ex. 3 at 42.

Petitioner returned to PA Grabrovac on September 3, 2020 to review the MRI. Ex. 3 at 24. Petitioner's pain was somewhat better from PT but nevertheless persisted, particularly with external rotation. *Id*. at 26. PA Grabrovac and Petitioner discussed treatment options, including continued PT, cortisone injection, and surgery. *Id*. Petitioner stated she would call the office when she decided on her treatment.

Two months later (November 12, 2020), Petitioner messaged her PCP stating that she had "experienced shoulder pain since Feb 2020 when a flu vaccine shot was administered in your office." Ex. 36 at 8. She noted that her orthopedist had diagnosed her with SIRVA, and that she could still feel pain at the injection site, had lost full ROM, and was unable to golf. *Id*.

Four months later (March 29, 2021), Petitioner saw PA Grabrovac for a pre-operative evaluation for upcoming shoulder surgery. Ex. 18 at 13. Petitioner underwent left shoulder arthroscopic rotator cuff repair and subacromial decompression on April 7, 2021. *Id*. at 12. Her post-operative diagnoses were left shoulder rotator cuff tear and left shoulder impingement. *Id*.

Petitioner saw PA Grabrovac for a post-operative follow up on April 14, 2021. Ex. 18 at 7. She was doing well, with no complaints. *Id*. at 9. Examination revealed no signs of infection, and sutures were removed. *Id*. She was referred for PT. *Id*.

Petitioner underwent a PT evaluation of her left shoulder on April 26, 2021. Ex. 28 at 85. Petitioner stated that her symptoms had begun "last January following a flu shot," and she had now undergone surgery. *Id*. at 87. She told the therapist that the surgeon had "cleaned up [her] tendons and removed a bone spur." *Id*. Petitioner was wearing a sling, and reported minimal pain that she rated two out of ten, ranging from zero at best to four out of ten at worst. *Id*. On examination, her ROM and strength were impaired. *Id*. at 88. Petitioner attended 21 PT sessions between April 26 and August 3, 2021. Ex. 28 at 2-92. During this time, on two occasions her pain spiked to six out of ten; the remainder of the time, it ranged between zero and four out of ten. *Id*.

Petitioner followed up with Dr. Ansari on May 27, 2021. Ex. 18 at 5. She was doing well, with minimal pain. *Id*. at 7. Two months later (July 28, 2021), she saw PA Grabrovac. *Id*. at 3. She was progressing well in PT. She still had some pain sleeping on her shoulder at night, but it was improving. *Id*. at 5. He recommended continued PT. *Id*. They discussed golfing, and he stated she could putt but should not drive a golf ball for another two months. *Id*.

Petitioner was discharged from PT on August 3, 2021. Ex. 19 at 3. She rated her pain one out of ten, and stated that her orthopedist had discharged her. *Id*. at 5. On examination, she had full active ROM in all planes, with mild difficulty with abduction. *Id*. at 6.

### B. Testimonial Evidence

Petitioner filed two declarations in support of her claim.[3] Exs. 1, 39. In her first (signed July 26, 2022), she states that at the time she received the flu vaccine, she was told that many people had complained of injection site pain after vaccination that year. Ex. 1 at 1. Therefore, when she experienced pain immediately after vaccination, which worsened within two days, she was not initially concerned. *Id*. However, soon her upper arm and shoulder became so painful that she lost ROM and could not move her arm in certain directions without a lot of pain. *Id*. She could not sleep on her left side or reach into a cabinet for a dish without pain. *Id*. at 1-2. Because it was the beginning of the COVID-19 outbreak, she was initially reluctant to see a doctor. *Id*. at 2.

By May 2020, Petitioner decided to seek care from an orthopedist. Ex. 1 at 2. She had missed a lot of her women's golf league by this time, and remained unable to play for

---

[3] Although Petitioner labeled Exhibit 1 and 39, as well as the remaining testimonial statements, as affidavits, they are not notarized. Nonetheless, they are acceptable as declarations sworn under penalty of perjury. 28 U.S.C. § 1746.

the rest of the year. *Id*. Her husband is disabled from an above-knee amputation, and her shoulder pain limited the care she was able to provide, leading him to assume some of her usual duties. *Id*. He was not able to fully take over cooking, resulting in increasing reliance on takeout and delivery of meals. *Id*.

PT helped with Petitioner's pain and flexibility, but she remained unable to resume all normal activities, including golf. Ex. 1 at 2-3. She could only drive a car for short distances. *Id*. at 3. After her MRI confirmed a partial thickness rotator cuff tear, she was given treatment options, including surgery. *Id*. She was reluctant to undergo surgery because COVID-19 was still "a significant threat" and medical facilities were overwhelmed. *Id*. She did her PT exercises at home, but continued to experience pain and limited ROM. *Id*. She did not think she would be able to golf again without surgery. *Id*. Therefore, she underwent surgery in April 2021. *Id*.

Petitioner describes an "extremely painful recovery of at least 6 weeks" before she could start working to regain full use of her arm. Ex. 1 at 3. Recovery took about six months, leading her to miss another season of her women's golf league. *Id*. at 4. While surgery restored the use of her arm and resulted in a nearly complete recovery, the timing "significantly disrupted my normally very active life." *Id*. She has been able to resume most activities, but still has residual intermittent pain in her left shoulder with certain movements. *Id*.

Petitioner filed a supplemental declaration that she signed on September 25, 2024. Ex. 39. She now states that she called her doctor on January 10th "to tell him of the pain I was experiencing," and was told that sometimes the vaccine can "leak" to nearby muscles and that probably explained her experience. *Id*. at 1-2. This occurred during a time of deep grief for Petitioner; she received the at-issue vaccine two days before the anniversary of the death of her oldest son. *Id*. at 2. She explains that the time around any anniversaries tends to be the worst. *Id*.

Petitioner explains that weeks went by with her pain escalating, and she soon lost ROM. Ex. 39 at 2. She was unable to see a doctor due to the outbreak of the COVID-19 Pandemic; her doctor's office was not seeing patients in person. *Id*. As a city council member, she was "privy to the rapidly developing Covid pandemic crisis so was hyper-aware of the unknown challenges and dangers we would be facing." *Id*. She was reluctant to impose on the few medical resources in her rural community, in addition to being concerned for her own health. *Id*. at 2-3.

As an elected official, Petitioner focused on how her community should respond to the crisis, rather than her own pain. Ex. 39 at 3. She and her colleagues needed to advise the public on how to protect themselves, determine how to protect city staff who were required to continue working, and work through how to proceed until state law was changed to allow official meetings to take place remotely. *Id*. at 3-4. Although her shoulder

pain had steadily escalated since vaccination and concerned her, in the context of the Pandemic, it "was not the first thing on my mind." *Id*.

Petitioner acknowledges that some of her records note an incorrect vaccination date, explaining that "[i]t is entirely possible with all the turmoil that was going on in my life then with the worsening pandemic, the time that had passed since my vaccinations and the recollections of my son's death, that I misremembered the month I was vaccinated and told a provider I was vaccinated in February as opposed to January 2020." *Id*. at 5. However, she is "absolutely certain and there is no doubt in my mind that the pain in my left shoulder started immediately following my receipt of the flu vaccination" and "there was no delay in pain onset." *Id*.

Petitioner states that although she has recovered and been able to resume many of her former activities, she continues to have lingering issues. Ex. 39 at 6-7. If she turns onto her left side while sleeping, she awakens in pain. *Id*. Her golf game has declined, and she sometimes experiences shoulder pain after golfing. *Id*. at. 7. She continues to have difficulty lifting her husband's wheelchair into the car without help. *Id*.

Petitioner's husband submitted a declaration in support of her claim. Ex. 2. He states that when Petitioner came home after receiving the at-issue vaccine, she commented on how much it hurt and where the shot was given, pointing to the outer edge of her triceps muscle where there is not much muscle. *Id*. at 1. After a few days, Petitioner told him the spot was still painful and was getting hard. *Id*. After a few weeks, she told him it was not getting better, and it was difficult even to raise her left arm due to pain. *Id*. She experienced difficulty driving and cooking, and missed two complete seasons of golf. *Id*. at 2.

Petitioner's husband explains that he had an above-knee amputation 20 years ago and has had serious pain issues for decades. Ex. 2 at 2. Because of Petitioner's injury, he had to take over many of her former household activities, including laundry and shopping. *Id*. at 2-3. He also took over a lot of the driving and cooking and they greatly increased eating takeout or having food delivered. *Id*. at 3. Petitioner does yoga, and he has observed her having difficulty with even simple poses. *Id*.

Petitioner's son and daughter in law filed declarations in support of her claim. Exs. 37, 38. Petitioner's son recalls a visit to Petitioner on March 1, 2020 when he and his wife did a lot of the cooking and cleaning – which Petitioner normally would not permit as she rarely, if ever, asks for help in the kitchen. Ex. 37 at 1. For this reason, he was surprised that she didn't protest when he asked her to sit down and let him do things. *Id*. She mentioned that her left shoulder was bothering her at that time, and had been since her January 2020 vaccination. *Id*.

Petitioner's daughter in law explains that her visit to Petitioner's home on March 1, 2020 occurred before she married Petitioner's son, and was the first time she had been

6

to their home. Ex. 38 at 1. Before their visit, Petitioner's son had said that his mom was a bit of a gourmet chef and had difficulty accepting help in the kitchen. *Id.* To her surprise, Petitioner allowed them to finish cooking and cleaning. *Id.*

Petitioner's daughter in law recalls Petitioner talking about her vaccination "a few months earlier" and the resulting pain. Ex. 38 at 1. She adds that she now knows Petitioner better, and she is very independent and "the fact that she accepted help in the kitchen at that time tells me she was in a lot of pain." *Id.* at 2.

Sam Norton, a former mayor who worked with Petitioner, submitted a declaration in support of her claim. Ex. 40. He recalls Petitioner telling him in mid-January 2020 of worsening left upper arm pain that started after her vaccination earlier that month. *Id.* at 1.

## II.    Factual Findings and Ruling on Entitlement

### A.  Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment,

or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . .  does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

### B.  Parties' Arguments on Entitlement

Petitioner asserts that her left shoulder pain began when she received the flu vaccine on January 6, 2020, then progressed over the next 48 hours and continued to worsen thereafter. Petitioner's Motion for Ruling on the Record, filed Oct. 10, 2024, at *16-19 (ECF No. 54) ("Mot."). She asserts that she called her PCP four days after vaccination about her pain and was told the vaccine may have leaked to nearby muscles,

explaining her pain. *Id*. at *16. She adds that at the time this occurred, she was dealing with personal grief and the early days of the Pandemic – and as a city council member, she was involved in the community response. *Id*. Thus, she tried to work through the pain. *Id*.

Petitioner argues that when she sought care in May 2020, her orthopedist attributed her symptoms to vaccination. Mot. at *18. Although Petitioner at times misstated that she received the flu vaccine in February 2020, she consistently maintained that her shoulder pain occurred contemporaneously with vaccination.[5] *Id*.

Respondent argues that Petitioner cannot prevail on a Table SIRVA claim because she has not demonstrated that her shoulder pain began within 48 hours of vaccination. Respondent's Response, filed Dec. 10, 2024, at *12-16 (ECF No. 55) ("Resp."). Respondent emphasizes that Petitioner did not complain of shoulder pain until three months after vaccination, and was not seen for it until over four months after vaccination. *Id*. at *12. And even then, she did not specify when her shoulder pain began, or stated that it began in February – which would place onset well outside of a 48-hour timeframe. *Id*. Even records that relate her pain to vaccination are vague as to how long after vaccination. *Id*.

Respondent acknowledges Petitioner's testimonial evidence alleging that she delayed care due to the Pandemic. Resp. at *14. However, Respondent points out that the wide-scale outbreak and corresponding stay-at-home orders did not occur until March 2020 – after Petitioner already had a significant window of time to see a provider – which she did, for a different concern, on March 11, 2020. *Id*.

Respondent raises concerns about the inconsistency between Petitioner's first declaration and supplemental declaration. Respondent highlights Petitioner's statement in her supplemental declaration that she called her PCP on January 10, 2020, and observes that in her initial declaration Petitioner did not mention this and instead stated that she was not concerned about her shoulder pain in the weeks after vaccination. Resp. at *15. Thus, her initial declaration states that she was *not* concerned about her shoulder pain, yet her supplemental declaration states that she was concerned enough to call her PCP four days after vaccination. *Id*. Respondent adds that the supplemental declaration was prepared after the Rule 4(c) Report, and clearly made for litigation purposes. *Id*.

---

[5] Petitioner reiterates her request for a hearing concerning onset and other aspects of her claim. Mot. at *12 n. 2. A hearing is not needed or warranted, however. "[A] special master has discretion whether or not to conduct an evidentiary hearing before deciding a case." *Hooker v. Sec'y of Health & Human Servs*., No. 02-472V, 2016 WL 3456435, at *21 (Fed. Cl. Spec. Mstr. May 19, 2016) (noting that section 12(d)(2)(D) of the Vaccine Act encourages special masters to decide cases without routine use of oral presentations, cross examination, or hearings, and that the Vaccine Rules allow a special master to decide a case on the record without a hearing); *see also Hovey v. Sec'y of Health & Human Servs*., 38 Fed. Cl. 397 (1997), appeal dismissed, 135 F.3d 773 (ruling that special master acted within his discretion in denying hearing).

Petitioner replies that she consistently attributed her left shoulder pain to vaccination. Petitioner's Reply, filed Jan. 10, 2025, at *2 (ECF No. 57) ("Reply"). She cites *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998), for the proposition that testimony given later in time may outweigh medical records if it is consistent, clear, cogent, and compelling. Reply at *2-3. And the Vaccine Act expressly allows a special master to find that onset occurred within the time set forth in the Table even though the occurrence of symptoms was not recorded or was incorrectly recorded. *Id.* at *3. Petitioner asserts that the medical records, bolstered by witness statements, support a finding that her pain began within 48 hours of vaccination. *Id*. at *4-6.

### C. Factual Findings on Onset

The record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination.

Petitioner first reported her shoulder pain to her PCP three months after vaccination, stating that the injection site from her vaccination was "*still* very sore and painful" – suggesting that her pain had persisted since that time. Ex. 36 at 3 (emphasis added). The next month, now four and a half months after vaccination, she told her orthopedist that her pain started after her vaccination – although she referred to that vaccination taking place in *February* rather than January. Ex. 3 at 30. Her orthopedist's assessment connected her shoulder pain to vaccination.

Similarly, Petitioner told her physical therapist that her pain began after vaccination in February, with her pain *beginning at the injection site* and moving up to her shoulder. Ex. 12 at 42 (emphasis added). In June 2020, she messaged her PCP about "what's happened with my left shoulder since my flu shot." Ex. 36 at 3. In August 2020, PA Grabrovac noted that her pain started "following a flu shot in January." Ex. 3 at 28. In November 2020, 11 months after vaccination, Petitioner messaged her PCP about shoulder pain that she had experienced since vaccination, although she again misstated vaccination as having occurred in February. Ex. 36 at 8. And Petitioner has provided testimonial evidence that supports these records.

I acknowledge that on multiple occasions Petitioner described her shoulder pain as beginning in February. However, on each such occasion she also stated that her pain started *after vaccination*. With this context, I find that Petitioner was likely describing pain that began after vaccination, but mistakenly recalled the month in which the vaccine was administered.

I acknowledge Respondent's concern about the incongruity between Petitioner's initial declaration and supplemental declaration. In her initial declaration, Petitioner states she was *not* initially concerned about her pain because at the time of vaccination, her PCP told her that other people had complained of pain after vaccination that year, but her later declaration states she was concerned enough to call her PCP about the pain. This

apparent inconsistency could be attributable to the passage of time after the events in question, and reduces the evidentiary value of the declarations. Certainly it calls into question onset (although the first official complaint of shoulder pain, from the April 2020 medical visit, is consistent with Table onset). Nonetheless, the medical record evidence is sufficient to support a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 13 at 117, 144-45; 188-89. She exhibited reduced ROM, and her pain and ROM limitations were limited to the vaccinated shoulder. Exs. 3 at 30; Ex. 12 at 43-44. She received a covered vaccine in the United States. Ex. 13 at 124. She experienced residual effects of her injury for more than six months. Ex. 3 at 26-28. And she states that a civil action has never been filed by anyone against a vaccine manufacturer or administrator for vaccine related injuries on her behalf, and no one has collected awards of settlements from them for these injuries. Ex. 20.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III.    Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs.*, No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and

suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award in the amount of $150,000.00, citing decisions in *Blanco*, *Wilson*, *Anglewicz*, and *Reed*, in which the claimants were awarded $135,000.00, $130,000.00, $130,000.00, and $160,000.00, respectively.[7] Mot. at *22-29.

Petitioner asserts that her shoulder pain "was significant at the outset," though she does not cite supporting records. Mot. at *22. She characterizes her medical course and sequela as falling in the moderate range of severity because she underwent surgical intervention and "extensive physical therapy interventions before and after" surgery. *Id*. at *24. Petitioner states that her injury duration was approximately 20 months, after which she experienced "a near return to her pre-vaccination baseline level of functioning. with only intermittent pain in the left shoulder with certain movements." *Id*. at *25.

Petitioner asks that I consider the impact her injury had on her quality of life. Mot. at *26. Prior to vaccination, Petitioner was active in her community and in local politics as a member of city council. *Id*. She participated in golf and yoga, cooked, handled household chores, served as a mentor in the school system, worked at a homeless shelter, and traveled. *Id*. After her injury, her work as a city council member "became difficult because of the pain she was experiencing, and she was no longer able to engage in any of her leisure activities." *Id*. She had difficulty sleeping, cooking, dressing, and driving a car. *Id*.

Petitioner asserts that her injury is similar to *Blanco* (other than the *Blanco* petitioner's injury lasting about four months longer, with multiple steroid injections and additional imaging, but attending less PT). Mot. at *27. And Ms. Taylor states that her injury duration was longer, with more PT, than the *Wilson* claimant. *Id*. at *27-28. She views her injury as similar to that in *Anglewicz*, and acknowledges that the *Reed* petitioner's injury persisted for longer and treatment included a steroid injection, but less PT. *Id*. at *28.

---

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[7] *Blanco v. Sec'y of Health & Human Servs.*, No.18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr July 6, 2020); *Wilson v. Sec'y of Health & Human Servs.*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr Mar. 18, 2021); *Anglewicz v. Sec'y of Health & Human Servs.*, No. 20-1504V, 2024 WL 2702415 (Fed. Cl. Spec. Mstr. Feb. 8, 2024); and *Reed v. Sec'y of Health & Human Servs.*, No. 16-1670V,  2019 WL 1222925 (Fed. Cl. Spec. Mstr. Feb. 1, 2019).

Respondent proposes a pain and suffering award of $57,500.00, relying on *Hunt* ($95,000.00 pain and suffering award) and *Shelton* ($97,500.00 pain and suffering award), and maintaining that Petitioner should be awarded less than the petitioners in those cases.[8] Resp. at *22-28.

Respondent asserts that Petitioner's injury is a "unique surgical case" for three reasons: she delayed reporting her injury for three months, had treatment gaps, and consistently reported low pain ratings. Resp. at *20. As such, he views an award of $57,500.00 as "consistent with awards in other cases of that nature." *Id*.

Respondent asserts that the cases Petitioner relies on all involve more severe injuries, and thus are not good comparables. Resp. at *23-24. The *Blanco* petitioner reported her injury less than a month after vaccination, and underwent four steroid injections in addition to surgery and PT. *Id*. at *24. Additionally, the *Blanco* petitioner reported severe pain and her injury duration was four months longer than Ms. Taylor's. *Id*. The *Wilson* petitioner also reported her injury one month after vaccination, and suffered a "moderately severe" injury. *Id*.

Respondent notes that the *Anglewicz* petitioner underwent two steroid injections in addition to surgery. Resp. at *25. And the *Reed* petitioner reported shoulder pain just 11 days after vaccination, treated with medications, a steroid injection, and surgery, and did not make a good recovery after surgery, continuing to treat with medication and PT and complain of worsening shoulder pain over two years after vaccination. *Id*.

Respondent views decisions in *Hunt* and *Shelton* as instructive, though he views Ms. Taylor's injury as less severe than either of those cases. Resp. at *26. Respondent emphasizes that Petitioner consistently reported low pain ratings. *Id*. at *26-27. Moreover, there is a six-month gap in treatment between her last PT session prior to surgery in September 2020 and her preoperative evaluation in March 2021. *Id*. at *27. Petitioner messaged her PCP once about her shoulder during this gap, and sought other health care, but did not treat her shoulder injury. *Id*.

Petitioner disagrees that her case is unique, and asserts that neither *Hunt* nor *Shelton* should be considered useful comparables because both are "outliers," rare instances of surgical cases involving awards of less than $100,000.00. Reply at *9-10 (citing *Double v. Sec'y of Health & Human Servs*., No. 21-0682V, 2024 WL 3648398, at *4 (Fed. Cl. Spec. Mstr. June 27, 2024) ("*Hunt* and *Shelton* are not useful comparables for this matter . . . both stand as 'outlier determinations, and rare instances of deviating from the above $100,000.00 'norm' for SIRVA cases involving surgery'")). Petitioner asserts that her case is not an outlier like those cases, and adds that Respondent's

---

[8] *Hunt v. Sec'y of Health & Human Servs*., No.19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr June 16, 2022); *Shelton v. Sec'y of Health & Human Servs*., No.19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

proposed award is $37,500.00 to $40,000.00 *less* than the awards in those cases. *Id*. at *11. The *Hunt* petitioner had several periods of time where she was pain-free, unlike Ms. Taylor, who still had a pain level of one out of ten even after surgery and post-operative PT. *Id*. at *11-12. The *Shelton* petitioner's initial treatment delay was almost five months, and that petitioner attended less PT and was pain-free at discharge. *Id*. at 13. And neither the *Hunt* petitioner nor the *Shelton* petitioner had to contend with delays or concerns surrounding the Pandemic. *Id*.

Petitioner does not consider cortisone injections a useful indicator of injury severity, asserting that her orthopedist only offered that treatment as a non-surgical option, but otherwise recommended surgery. Reply at *12. Petitioner asserts that "[l]ogic dictates that the orthopedic specialist recommended surgery because petitioner's symptoms were sufficiently severe to warrant surgical intervention." *Id*.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

I find that Petitioner suffered an injury that largely resolved within 19 months, with some initial treatment delay, and overall was relatively mild in the context of injuries involving surgery. She did not seek care until over four months after vaccination, and stopped treatment for a six-month period of time. She treated with surgery and PT, and had a good recovery after completing post-operative PT. On a few occasions, she stated that with use her pain rose to six out of ten, but otherwise generally reported low pain levels throughout her treatment course.

The cases Petitioner cites involve injuries more severe than hers.[9] Of those, the closest are *Blanco* and *Wilson* – but both involve petitioners who sought care much sooner, underwent significant surgical procedures,[10] and whose injuries persisted for longer. The decision in *Anglewicz* suggests that it is an outlier, in that the pain and suffering award takes into account the impact of the claimant's injury on her ability to work. *Anglewicz*, 2024 WL 2702415, at *3. And although I have described *Hunt* and

---

[9] I decline to adopt Petitioner's suggestion that I treat her claim as comparable to those involving claimants who underwent cortisone injections *in addition to* surgery; while Ms. Taylor underwent surgery but did *not* receive cortisone injections.

[10] The *Blanco* petitioner's surgery was described as "significant": a left shoulder arthroscopic subacromial decompression, arthroscopic biceps tenotomy with glenohumeral debridement,, and arthroscopic rotator cuff repair. *Blanco*, 2020 WL 4523473, at *3. The *Wilson* petitioner underwent "shoulder arthroscopy with lysis and resection of adhesions, and extensive glenohumeral debridement." *Wilson*, 2021 WL 1530731, at *3.

*Shelton* as outliers, Ms. Taylor's case bears many similarities to *Shelton* in particular, with Ms. Taylor having sought care sooner than the *Shelton* petitioner, but the *Shelton* petitioner receiving three steroid injections, compared to none for Ms. Taylor.

Taking these factors into consideration, I find that an award of **$110,000.00** for pain and suffering is appropriate in this case.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $110,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**[11] Additionally, I find that Petitioner is entitled to **$403.43 in unreimbursable expenses**.[12]

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $110,403.43, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[13]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[11] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[12] The parties agree that this sum is reimbursable. Reply at *7; Respondent's Status Report, ECF No. 60, at *1.

[13] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.